UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

IVIN ROMON RICHARDSON,
        Plaintiff,

v.                                          Case No.  3:17cv921/RV/EMT

DETECTIVE PATRICK ALFRED BRADLEY,
        Defendant.
_____/

## REPORT AND RECOMMENDATION

This prisoner civil rights case, filed under 42 U.S.C. § 1983, is before the court

on Defendant's motion for summary judgment and supporting evidentiary materials

(ECF No. 41).  Plaintiff Richardson filed a response, with evidentiary materials, in

opposition to the motion (ECF No. 51).  The matter is referred to the undersigned

for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R.

72.2(C).  The undersigned concludes that Defendant's summary judgment motion

should be granted.

I.      BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Ivin Romon Richardson ("Richardson"), proceeding pro se and in

forma pauperis, was an inmate of the Escambia County Jail when he commenced

this case (*see* Compl., ECF No. 1).  Richardson became an inmate of the Florida

Department of Corrections during the pendency of this case (*see* Notice of Change

of Address, ECF No. 16).  Richardson sues Patrick Bradley, a detective with the Pensacola Police Department ("PPD") (Second Amended Complaint, ECF No. 11). Richardson asserts claims of false arrest, malicious prosecution, and a violation of his equal protection and due process rights under the Fourth and Fourteenth Amendments (*id.*).  Richardson alleges Detective Bradley filed an affidavit for his arrest for the shooting of Ms. Dominique Blount which intentionally omitted and misrepresented materials facts, and caused Richardson's arrest and prosecution without probable cause (*see id.*).  Richardson also alleges Detective Bradley treated him less favorably than a similarly situated individual (*see id.*).   As relief, Richardson requests compensatory damages in the amount of $1.7 million for "lost wages, attorney fees, pain and suffering, emotional collapse, reputation ruin, false imprisonment, and malicious prosecution" (*id.*).  Richardson also seeks punitive damages in the amount of $1 million (*id.*).

Detective Bradley moves for summary judgment claiming there exists no genuine issue of material fact with respect to Richardson's claims, and Bradley is entitled to judgment as a matter of law (*see* Mot. Summ. J.).  Richardson opposes summary judgment claiming Detective Bradley lacked probable cause to arrest him, and Bradley intentionally withheld and misrepresented material facts from the

probable cause affidavit submitted in support of the arrest warrant (*see* Opp'n. Mot. Summ. J.).

## II.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.   <u>Summary Judgment Standard</u>

To prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his or her case or present affirmative evidence that the nonmoving party will be unable to prove his or her case at trial.  *See* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial.  *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248.  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The nonmoving party must show more than the existence of a "metaphysical doubt" regarding the

material facts.  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  Speculation or conjecture from a party cannot create a genuine issue of material fact.  *See* <u>Cordoba v. Dillard's, Inc.</u>, 419 F.3d 1169, 1181 (11th Cir. 2005).  "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment."  <u>Young v. City of Palm Bay, Fla.</u>, 358 F.3d 859, 860 (11th Cir. 2004); *see also* <u>Celotex Corp.</u>, 477 U.S. at 324.  The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  *See* <u>Celotex Corp.</u>, *supra*; <u>Owen v. Wille</u>, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); <u>Hammer v. Slater</u>, 20 F.3d 1137 (11th Cir. 1994).

Regarding the factual positions asserted by the parties, the court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions**.  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
. . . .

(4) **Affidavits or Declarations**. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010).

Facts asserted in hearsay statements which are not subject to a hearsay exception, and thus would not be admissible in evidence, are insufficient to show that a fact is genuinely disputed. "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." Jones v. UPS Ground Freight, 683 F.3d 1283, 1294 (11th Cir. 2012) (citing Pritchard v. S. Co. Servs., 92 F.3d 1130, 1135 (11th Cir. 1996)). If a fact cannot be presented in a form that would be admissible in evidence, it cannot be used for purposes of summary judgment. *See* Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999); Fed. R. Civ. P. 56(c).

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will

consider the fact undisputed for purposes of the motion for summary judgment or grant summary judgment if the moving party's motion and supporting materials— including the facts considered undisputed—show that the moving party is entitled to it.  *See* Fed. R. Civ. P. 56(e)(2, 3).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him or her.  *See* Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F. 3d 1271, 1282 (11th Cir. 1999).  Nonetheless, the nonmoving party still bears the burden of coming forward with sufficient evidence of every element that he or she must prove.  *See* Celotex Corp., 477 U.S. at 317.  A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322.

B.    Material Facts

As this case comes before the court on Defendant Bradley's motion for summary judgment, the court is required to view the facts in the light most favorable to Richardson, the nonmoving party.  *See* Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993); *see also* Ashcroft v. Iqbal, 556 U.S. 662, 679, 129

S. Ct. 1937, 173 L. Ed. 2d 868 (2009).    The court does so here, referring to

Richardson's verified Second Amended Complaint, and taking those facts from the

parties' pleadings and summary judgment materials of record.    *See* Perry v.

Thompson, 786 F.2d 1093, 1095 (11th Cir. 1986) (holding that specific facts pled in

a sworn complaint must be considered in opposition to summary judgment); Fed. R.

Civ. P. 56(c); N.D. Fla. Loc. R. 56.1(B), (C), (F).    Matters stated below as "facts"

for purposes of summary judgment may not be the actual facts.    *See* Montoute v.

Carr, 114 F.3d 181, 182 (11th Cir. 1997).

> 1.    Richardson's Arrest and Prosecution for Shooting and Robbing
>         Dominique Blount

Both parties submitted a copy of the Pensacola Police Department's ("PPD")

Offense Report #PPD15OFF001542 ("Offense Report") in support of their positions

(Mot. Summ. J., Ex. I, Affidavit of Patrick Bradley, attached Ex. A; Opp'n to Mot.

Summ. J., Ex. A, Offense Report).    According to the Offense Report, on February

17, 2015, at approximately 4:01 a.m., Officer Rick Mauro responded to Baptist

Hospital in reference to a gunshot victim, Dominique Blount (Offense Report, p. 8).

Ms. Blount provided Officer Mauro with the following sworn verbal statement

regarding the shooting:

> Blount said that she was getting home and walking up to the door
> and felt a pierce in her leg.  Blount siad [sic] that she didn't here [sic]
> or see anything at this time.  Blount said her friend who was with her

said "did you here [sic] that shot, you might of gotten shot" Blount at time [sic] thought she could of [sic] possibly been shot with a BB GUN or maybe just hit her knee on a nail or something. When Blount got inside she started to feel numbness in her leg and tried to take a bath to ease the pain. Blount said after she couldn't get the pain to go away, she went to hospital to be checked out. Blount was advised by the doctor that she had a round in her knee and would need surgery.

(Offense Report, p. 8). The doctor showed Officer Mauro an x-ray of Ms. Blount's knee with the round in it (*id.*). Officer Mauro requested that the doctor contact the PPD to collect the round as evidence after it was removed from Ms. Blount's knee (*id.*).

According to the Offense Report, at 5:06 a.m. on February 17, 2015, Officer Samantha Bradley contacted Dominique Blount's mother, Claretta Blount, at her residence on 808 N. 6th Avenue (Offense Report, p. 5). Claretta Blount told Officer Bradley that she picked up Dominique from Walmart at approximately 9:00 p.m. on February 16, 2015 (*id.*). Claretta Blount told Officer Bradley that she drove Dominique to 808 N. 6th Avenue (*id.*). Claretta Blount told Officer Bradley that Dominique took the car to run errands (*id.*). Officer Bradley also contacted Dominique Blount's grandmother, Marjorie Dean (*id.*). Ms. Dean told Officer Bradley that Dominique resided at 1211 N. 6th Avenue (*id.*).

According to the Offense Report, at 11:29 a.m. on February 17, 2015, Defendant Detective Bradley met with Dominique Blount at Baptist Hospital

(Offense Report, p. 5). Ms. Blount told Detective Bradley she was shot in the top of her right knee cap while going in to her house at 1211 N. 6th Avenue (*id.*). Ms. Blount told Bradley that just prior to being shot, at approximately 10:00 p.m., she dropped off her daughter at the house of her daughter's father, Antoine Wilson, who lived at 7730 Castlegate Drive (*id.*). Ms. Blount provided Bradley with Mr. Wilson's phone number (*id.*). Ms. Blount told Detective Bradley she drove directly to her home from the Castlegate address without stopping, and that she was driving her mother's car (*id.*). Later that day, Detective Bradley telephoned Dominique Blount and asked her to tell her mother, Claretta Blount, that he needed to inspect her car for bullet holes (*id.*). Detective Bradley noted in the Offense Report that Claretta Blount did not have a phone (*id.*). Detective Bradley also attempted to speak with Antoine Wilson (*id.*). Bradley attempted to telephone Wilson, but the phone number provided by Dominique Blount was a non-working number (*id.*). Bradley knocked on the door of 7730 Castlegate Drive, but no one answered (*id.*). Detective Bradley then canvassed the neighborhood where the shooting occurred at 1211 N. 6th Avenue (*id.*, p. 6). Bradley spoke with Bernadette Ravelli, who lived next door at 1215 N. 6th Avenue (*id.*). Ms. Ravelli told Detective Bradley that the night before (on February 16, 2015), she heard a single gunshot and "some yelling" next door (*id.*). Ms. Ravelli told Bradley she was unsure of the time, but shortly after she heard

the shot, she heard loud banging on the front door of the house next door (*id.*).

Detective Bradley noted that the loud banging was possibly PPD officers conducting

a follow-up (*id.*).  Detective Bradley then contacted Tim Byrd, a security officer at

Baptist Hospital (*id.*).  Mr. Byrd stated he would obtain footage from a surveillance

camera of Dominique Blount's arrival at the hospital (*id.*).

According to the Offense Report, on February 17, 2015, at 7:10 p.m., Officer

Mary Burnside collected the projectile removed from Dominique Blount's knee

(Offense Report, p. 7).  Officer Burnside forwarded the projectile to the Florida

Department of Law Enforcement ("FDLE") for firearm/tool mark examination and

entry into the National Integrated Ballistic Information Network ("NIBIN") (*id.*).[1]

According to the Offense Report, on February 20, 2015, Detective Bradley

obtained video footage from the ambulance bay area of Baptist Hospital (Offense

Report, p. 6).  Detective Bradley observed that Dominique Blount was dropped off

by a white SUV (Tahoe/Denali/Yukon) (*id.*).  After exiting the vehicle, Ms. Blount

was pushed inside the hospital in a wheelchair by the black female driver of the SUV

(*id.*).

---

[1] According to information available on the public website of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, firearms examiners or technicians enter cartridge casing evidence into NIBIN, and the images are correlated against the database.  This allows law enforcement officers to compare their evidence with other evidence from their jurisdiction and jurisdictions across the country.

According to the Offense Report, on February 24, 2015, Detective Bradley left a voicemail message for Dominique Blount requesting that she contact him (Offense Report, p. 6).

According to the Offense Report, on Monday, March 9, 2015, Ms. Blount called Detective Bradley and stated she knew who shot her, but she was originally too frightened to report the shooter's identity to police (Offense Report, p. 6). Detective Bradley conducted a sworn audio/video recorded interview with Dominique Blount in an interview room at the police station (*id.*). Ms. Blount stated that on the night of the shooting, she arrived home at approximately 9:00 p.m., and noticed that a light was on, and the top deadbolt on the front door was locked (*id.*). Ms. Blount stated she never leaves any lights on and never locks the deadbolt, because it is not functioning properly and extremely difficult to unlock (*id.*). Ms. Blount stated she was able to unlock the deadbolt after several minutes, and she pushed open the door, but it opened only slightly, and it appeared that something was preventing it from fully opening (*id.*). Ms. Blount stated she pushed the door harder and saw a muzzle flash and heard a gun shot from within the residence (*id.*). Ms. Blount stated she initially did not realize she had been shot, and she forced open the door and stated, "Who is in my fucking house?" (*id.*). Ms. Blount stated that at that moment she was able to clearly see her attacker's face and recognized him as

lvin Richardson.   Ms. Blount stated that the attacker's entire body was covered,

except for his face, and he was wearing gloves (*id.*). Ms. Blount stated that as soon

as she saw the attacker's face, he forced her to turn around, grabbed her by the hair,

and forced her to the floor (*id.*).   Ms. Blount stated that Richardson told her not to

move or he would kill her (*id.*).   Ms. Blount stated Richardson stated that he knew

where her family lived, and he would kill them too (*id.*).   Ms. Blount stated

Richardson then produced duct tape and taped her hands and feet together (*id.*). Ms.

Blount stated Richardson asked her where her valuables were located and whether

she had any money (*id.*). Ms. Blount stated Richardson then ransacked the house as

she laid on the floor of the front room (*id.*). Ms. Blount stated Richardson eventually

told her he was leaving and not to call the police or he would kill her (*id.*).   Ms.

Blount stated that after Richardson left, she cut the duct tape off her legs and hands

and freed herself (*id.*).   Ms. Blount stated that Richardson stole her HP laptop

computer valued at $500.00, a diamond ring valued at $2,700.00, and .22 semi-

automatic Smith & Wesson pistol, SIN: L268835 valued at $500.00 (*id.*).   Ms.

Blount stated that at that point, she realized she had not bumped her knee, but had

been shot in the knee (*id.*).   Blount stated she called a friend to transport her to the

hospital (*id.*). Ms. Blount stated she had not discussed this new account with anyone

(*id.*).   Ms. Blount stated she was frightened of Richardson and afraid to report the

truth to law enforcement because she was on probation at the time of the shooting (*id.*). Detective Bradley learned that Ms. Blount's probation was terminated on March 6, 2015 (*id.*). Ms. Blount provided Detective Bradley with a .22 caliber shell casing, which she stated she found just inside the front door of her residence (*id.*, pp. 6–7). Ms. Blount stated that Richardson broke a window to possibly enter the residence, but the window was since repaired by her landlord (*id.*, p. 7).

According to the Offense Report, another PPD officer entered Ms. Blount's stolen firearm into the FCIC/NCIC system (Offense Report, p. 7).

According to the Offense Report, Detective Bradley asked Detective Stackpole to show Ms. Blount a photo line-up (Offense Report, p. 8–9). Detective Stackpole contacted Ms. Blount in an interview room at the police station (*id.*). Detective Stackpole read photo line-up instructions to Ms. Blount from an instruction sheet (*id.*, p. 9). Ms. Blount stated she understood the instructions, and placed her initials on the instruction sheet (*id.*). Detective Stackpole showed Ms. Blount the photo line-up (*id.*). Ms. Blount immediately selected photo number two as the photo of the person who shot her (*id.*). Ms. Blount stated, "That's him right there." (*id.*). Detective Stackpole asked Ms. Blount to circle the photo of the person she selected, and place her signature and the date and time below the photo (*id.*).

According to the Offense Report, Detective Stackpole left the interview room and provided the photo line-up to Detective Bradley (*id.*).

According to the Offense Report, on March 10, 2015, Officer Mary Burnside forwarded the .22 caliber spent shell casing to Florida Department of Law Enforcement ("FDLE") for entry into NIBIN (Offense Report, p. 9).

According to the Offense Report, on March 13, 2015, Detective Bradley contacted Officer Solange Garcia-Alonso and requested that she respond to 808 N. 6th Avenue (the residence of Dominique Blount's mother and grandmother) to collect a pair of pants which may contain DNA and/or a bullet hole (Offense Report, p. 10). Officer Garcia-Alonso went to the residence and contacted Dominique Blount's grandmother, Marjorie Dean (*id.*). Ms. Dean told Officer Garcia-Alonso that the pants were placed inside a plastic bag, and provided a white Walmart plastic bag containing a pair of black pants labeled "Boundaries, L/G," with duct tape (*id.*). Officer Garcia-Alonso took the pants to the police department's crime lab (*id.*). Officer Garcia-Alonso observed strips of gray duct tape on the exterior front lower parts of both sides of the pants (*id.*). Officer Garcia-Alonso also observed brown stains of suspected blood on the duct tape (*id.*). Officer Garcia-Alonso photographed the pants and forwarded them to the PPD's property management department (*id.*).

According to the Offense Report, on March 16, 2015, Dominique Blount left a voice message for Detective Bradley stating that an acquaintance left a note on her porch stating that Richardson's phone number was 786-458-3562 (Offense Report, p. 7). Also on that day, Detective Bradley attempted to call Ms. Blount's landlord, but was unsuccessful (*id.*).

According to the Offense Report, on March 18, 2015, Detective Bradley met with Dominique Blount at her residence (Offense Report, p. 7). Detective Bradley photographed the repaired window on the north side of the residence, which was believed to be the suspect's entry point (*id.*). Bradley also photographed a broken window leaning against the house underneath the repaired window (*id.*). Detective Bradley noted that broken glass was visible on the inside of the residence underneath the repaired window, as well as outside the residence on the ground underneath the repaired window (*id.*). Detective Bradley also photographed the broken window pane on the west (back) side of the residence, which was believed to be where the suspect initially attempted to enter (*id.*). Bradley also photographed the back door of the residence next to the broken window pane (*id.*). Bradley noted that the door was barricaded with a 2x4, which made it nearly impossible to enter the residence through the door (*id.*). Detective Bradley collected paperwork for the stolen

diamond ring, which included photographs of the ring, and indicated that its appraised value was $2,719.75 (*id.*).

Detective Bradley contacted Dominique Blount's probation officer (Opp'n to Mot. Summ. J., Ex. B, Def.'s Resp. to Pl.'s Interrog. No. 11).

On March 26, 2015, Detective Bradley submitted the following probable cause affidavit to an Escambia County Circuit Court judge:

> On 2/16/15 at approximately 2230 hours, Dominque Blount arrived home from work at her residence of 1211 N. 6th Avenue. As she entered the front door, she was shot by an intruder who had broken into her residence. Blount stated that when she entered the front door, she saw a flash and was shot in the right knee cap as she crossed the threshold. Once inside, Blount stated that the black male suspect pointed the gun at her chest and grabbed her by her shoulder. Blount stated that the suspect then spun her around in order to face her away from him to conceal his identity. Blount stated that the suspect's face was not covered. Blount was then forced to the floor at gunpoint where she was interrogated as to where she kept her valuables. The suspect told Blount to stay down or she would be killed. The suspect then went through the purse Blount was carrying and ransacked several rooms throughout the house. Blount stated that the suspect produced duct tape and used it to bind her hands behind her back and tie her legs together near her ankles. Blount was able to get a clear view of the suspect's face and hear his voice as she was accosted. Blount stated that with these identifiers she was able to recognize the suspect from the neighborhood as Ivin Richardson. Blount has lived in the neighborhood since she was a little girl and her family has lived in the same house on and off for years.

> The suspect stole a 9 studded diamond ring worth $2700, an HP laptop computer worth $500, and a .22 caliber firearm belonging to Blount. That same firearm was used to shoot Blount. A small caliber, likely a .22, projectile was removed from Blount's right leg after several

surgeries.  Blount is permanently scared [sic] and walks with a cane.  I was able to photograph the broken windows with an estimated $200 in damage, at the residence, and collect the pants that Blount was wearing on the night she was shot.  The pants still had duct tape, blood, and an apparent small single hole near the front right knee cap area of the pants.

On 3/9/15 Blount was presented with a photographic line-up of Richardson by Detective Stackpole.  Blount immediately selected Richardson as the suspect.  Richardson is a multi-convicted felon as of 3/26/15.

(Mot. Summ. J., Ex. I, Def.'s Aff. ¶ 3, attached Ex. B; Mot. Summ. J., Ex. G, Warrant).  On March 26, 2015, the judge signed a warrant for Richardson's arrest on the following charges:  aggravated battery with a deadly weapon, use or display of a firearm during commission of a felony, possession of a weapon by a convicted felon, damage to property, armed burglary of a dwelling, grand theft, grand theft of a firearm, and home invasion robbery with a firearm (*id.*).

Detective Bradley arrested Richardson on March 27, 2015, at Sacred Heart Hospital, after Richardson received surgery for a gunshot wound to his hand/arm, and Richardson's doctor had authorized his discharge (Mot. Summ. J., Ex. I, Def's. Aff. ¶ 3; Opp. to Mot. Summ. J., Ex. A, Def.'s Resp. to Pl.'s. Req. for Admis. No. 2; Opp. to Mot. Summ. J., Ex. D, Pl.'s Aff., pp. 1, 3).  Bradley transported Richardson to the police department and interviewed him (Mot. Summ. J., Ex. I, Def.'s Aff. ¶ 5; Opp'n to Mot. Summ. J., Ex. A, Def.'s Resp. to Pl.'s Req. for Admis.

No. 1).  Richardson denied that he shot Dominique Blount (Opp'n to Mot. Summ. J., Ex. D, Pl.'s Aff., p. 3).  Richardson told Detective Bradley that he had known Ms. Blount for several years, and that she would be able to recognize him on sight or by his voice (Offense Report, p. 7).  Richardson told Detective Bradley he was in Miami at the time of the shooting, and that someone drove him there prior to the shooting (Offense Report, p. 7; Opp'n to Mot. Summ. J. Ex. A, Def.'s Resp. to Pl.'s Req. for Admis. No. 1).  Richardson told Bradley he stayed at the Budget Inn in Miami with his girlfriend (Second Am. Compl., p. 10; Opp'n. to Mot. Summ. J., p. 87). Detective Bradley repeatedly asked Richardson to provide information to enable him to verify Richardson's whereabouts on February 16, 2015 (Mot. Summ. J., Ex. I, Def.'s Aff. ¶ 5).  Richardson refused to provide Bradley the name of the person who drove him to Miami (Mot. Summ. J., Ex. H, Pl.'s Dep. 17:17–18:3; Opp'n to Mot. Summ. J., Ex. A, Def.'s Resp. to Pl.'s Req. for Admis. No. 1).  Richardson told Detective Bradley the name of his girlfriend, but Richardson did not provide Detective Bradley with any information as to how to contact the girlfriend or her brother in Miami (Mot. Summ. J., Ex. H, Pl.'s Dep. 18:18–19:13; Opp'n to Mot. Summ. J., Ex. A, Def.'s Resp. to Pl.'s Req. for Admis. No. 1).

During the interview, Richardson also told Detective Bradley that Antoine Wilson shot him on March 24, 2015 (Opp. to Mot. Summ. J., Ex. D, Pl.'s Aff., p. 3;

Mot. Summ. J., Ex. I, Def.'s Aff. ¶ 6).  Detective Bradley reviewed the PPD's call history to determine if there were any reports of shots fired at that time (Def.'s Aff. ¶ 6).  Bradley and two other law enforcement officers walked the area where Richardson claimed to have been shot and looked for shell casings (*id.*).  Detective Bradley knocked on the door of potential witnesses, but was unable to contact anyone (*id.*).  Bradley requested video surveillance from a restaurant which Richardson claimed he visited on the night he was shot, but the restaurant was unable to provide any video (*id.*).  Detective Bradley did not seek a warrant for Antoine Wilson's arrest, because Bradley did not believe there was probable cause to believe that Mr. Wilson had committed a crime (*id.*, ¶ 7).  The case went inactive until future leads could be developed (*id.*, ¶ 6).

Richardson had an initial appearance on March 30, 2015, before a circuit court judge (Mot. Summ. J., Ex. J, Docket, Case No. 2015-CF-001368).  The court made a preliminary determination that probable cause existed, based upon the information included in the arrest warrant, to hold Richardson in custody until Richardson made bond in the amounts stated in the court's order (*see* Preliminary Probable Cause Determination, attached to instant Report and Recommendation).  The court also appointed the public defender's office to represent Richardson (*id.*).

According to the Offense Report, on April 14, 2015, Detective Bradley learned that the NIBIN results were "negative" for the .22 caliber shell casing collected from Ms. Blount's residence (Offense Report, p. 7).

On April 15, 2015, the State Attorney's Office charged Richardson with Burglary of Dwelling While Armed with Firearm (Count 1), Aggravated Battery While Actually Possessing Firearm (Count 2), Possession of Firearm by Convicted Felon (Count 3), Grand Theft (Count 4), Grand Theft of a Firearm (Count 5), and Criminal Mischief (Count 6) (Mot. Summ. J., Ex. N, Information).

On October 13, 2015, Richardson's public defender issued a subpoena duces tecum to the custodian of records of a Budget Inn in Miami (Mot. Summ. J., Ex. K, subpoenas). Records from the Budget Inn show that on February 17, 2015, at 9:28 p.m., approximately 23 hours after Ms. Blount was shot, Richardson registered at the Budget Inn, 8929 NW 27th Avenue, Miami, Florida (Mot. Summ. J., Ex. L, Budget Inn Registration Card). Records from the Budget Inn show that Richardson again registered at the same motel on February 20, 2015, at 6:08 p.m. for one night (*id.*).

A jury trial was held on December 3, 2015, on all charges except Count 3 (possession of a firearm by a convicted felon), which was severed (Mot. Summ. J., Ex. J, Docket). Richardson's counsel did not admit any records from the Budget Inn

as evidence at Richardson's trial (Mot. Summ. J., Ex. M, Trial Exs.). Richardson's counsel presented a defense to the jury that it was Antoine Wilson who shot Ms. Blount (Mot. Summ. J., Ex. H, Pl.'s Dep. 7:21–25). The jury found Richardson not guilty of all charges (Mot. Summ. J., Ex. O, Verdict). On January 20, 2016, the State Attorney's Office filed a nolle prosequi on Count 3 (Mot. Summ. J., Ex. P, Nolle Prosequi).

2. <u>Richardson's Arrest and Prosecution for Violation of Probation</u>

On February 22, 2000, Richardson was found guilty by a jury of robbery with a firearm in Escambia County Circuit Court, Case No. 1999-CF-003228 (Mot. Sum. J., Ex. Q, Docket). On May 4, 2000, the court sentenced Richardson to 15 years in prison, with a 10-year mandatory minimum, followed by a 5-year term of probation (*id.*). Richardson subsequently pleaded guilty to a severed count of possession of a firearm by a convicted felon, and was sentenced to a mandatory minimum term of 3 years in prison, with credit for 2 years and 65 days, to run concurrently with the robbery sentence (*id.*).

On March 12, 2014, after Richardson was released from prison, he was arrested for VOP (Mot. Sum. J., Ex. Q, Docket). The State declined to prosecute the VOP, and Richardson was restored to probation on May 8, 2014 (*id.*). Richardson was again arrested for VOP on July 14, 2014 (*id.*). Richardson posted bond in

September of 2014 (*id.*).  Pursuant to an agreement between Richardson and the State, the court modified Richardson's probation (*id.*).

On December 23, 2014, a VOP warrant issued for Richardson's arrest (Mot. Summ. J., Ex. R, Aff. VOP, Ex. S, Warrant).  When Detective Bradley arrested Richardson on March 27, 2015 for the Blount shooting, Bradley was aware of the outstanding VOP warrant (Mot. Summ. J., Ex. I, Def.'s Aff. ¶ 4).  An officer with the Escambia County Sheriff's Office served the arrest warrant on Richardson on March 27, 2015, the same day Richardson was arrested for the shooting of Ms. Blount (*id.*).  Richardson remained in custody for the VOP until April 15, 2016 (Mot. Summ. J., Ex. Q, Docket; Ex. X, Order on Mot. To Reduce, Modify, or Set Bond, Ex. Y, Hr'g Worksheet, 4/15/2016, Ex. Z, Escambia Cnty. Jail Inmate Rs. for Richardson, Ivin Romon).

### 3.    Dominique Blount's Probation

According to the public docket of the Escambia County Clerk of Court, Case No. 2013-CF-004851, Dominque Blount pleaded no contest to one count of resisting arrest without violence and one count of possession of less than 20 grams of marijuana on April 2, 2014, and was sentenced to concurrent terms of one year of probation (Mot. Summ. J., Ex. B, Docket Sheet, Ex. C, Order of Probation).  One of the conditions of her probation was that she not possess, carry, or own any firearm

(Mot. Summ. J., Ex. C, Order of Probation).  On January 30, 2015, prior to the shooting, Ms. Blount submitted a pro se motion for early termination of probation to the judge's office and the prosecutor's office (Mot. Summ. J., Ex. D, Pro Se Mot. to Modify/Terminate Probation/Community Control).  On February 12, 2015, also prior to the shooting, the court set a hearing on Ms. Blount's motion for March 6, 2015 (Mot. Summ. J., Ex. E, Order Setting Hearing on Motion for Early Termination of Probation).  The hearing was held on March 6, 2015, after the shooting, at the conclusion of which the court terminated Ms. Blount's probation (Mot. Summ. J., Ex. F, hearing worksheet).

     C.    <u>Discussion</u>

         1.    <u>Fourth Amendment False Arrest/Malicious Prosecution Claims</u>

Richardson argues the only evidence linking him to the crimes involving Ms. Blount was Ms. Blount's statements and her identification from the photo line-up (Opp'n. to Mot. Summ. J.).  Richardson contends it was unreasonable for Detective Richardson to rely upon Ms. Blount's statements and identification, because she provided different stories to police, and did not provide the final version until after her probation was terminated.  Richardson contends Ms. Blount's statements were untrustworthy, unreliable, and insufficient to form a basis for probable cause. Richardson argues it was also unreasonable for Detective Bradley to rely upon the

broken windows and pants as evidence, because Bradley collected this evidence three weeks after the shooting, and there were numerous other reasonable explanations as to how the windows were broken and the shooting occurred. Richardson argues Detective Bradley did not process Ms. Blount's house or the spent shell casing for fingerprints, and Bradley did not attempt to verify whether Richardson was in Miami at the time of the shooting.

Richardson also argues Detective Bradley intentionally omitted material facts from the probable cause affidavit, which misled the judge and were crucial to the probable cause issue (Second Am. Compl.; Opp'n to Mot. Summ. J.). Richardson alleges Detective Bradley omitted the fact that Ms. Blount lied to investigators about the details of the shooting and the identity of the shooter. Richardson alleges Detective Bradley omitted the fact that three weeks elapsed between the date of the shooting and the date Bradley interviewed Ms. Blount at the police station, conducted the photo line-up, and collected evidence (i.e., the shell casing, Ms. Blount's pants, and photographs of the broken windows). Richardson also alleges Detective Bradley misled the judge to believe that the photo line-up was random by omitting the fact that Richardson's photo was included only because Ms. Blount stated she knew her attacker was "Ivin" from the neighborhood. Richardson alleges Detective Bradley also omitted the fact that he had contacted Ms. Blount's probation

officer and knew that Ms. Blount was seeking early termination of her probation when the shooting occurred, and that she had avoided Bradley until her probation was terminated.  Richardson alleges Detective Bradley omitted the fact that he failed to process the house or shell casing for fingerprints.

Detective Bradley argues Richardson's false arrest claim fails, because Richardson was arrested pursuant to an arrest warrant (Mot. Summ. J.).  Detective Bradley further argues Richardson cannot satisfy the elements of a malicious prosecution claim.  Bradley argues Richardson cannot show that Bradley was the legal cause of Richardson's prosecution, because Richardson failed to identify any admissible evidence that Bradley exerted any pressure or influence on prosecutors. Bradley additionally argues there was probable cause for Richardson's arrest, and Richardson cannot establish Bradley acted with malice.  Detective Bradley argues he is entitled to qualified immunity from Richardson's malicious prosecution claim, because he had at least arguable probable cause to arrest Richardson.  Detective Bradley additionally argues Richardson had no expectation of liberty at the time of his arrest or any time during his prosecution, because he was detained on the unrelated VOP warrant during the entire time.

Qualified immunity protects public officers "from undue interference with their duties and from potentially disabling threats of liability."  Harlow v. Fitzgerald,

457 U.S. 800, 806, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  It allows government officials to "carry out their discretionary duties without the fear of personal liability or harassing litigation."  Oliver v. Fiorino, 586 F.3d 898, 904 (11th Cir. 2009).  "Because qualified immunity is a defense not only from liability, but also from suit, it is important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible."  Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation omitted).

To establish qualified immunity, a defendant first must show that he was acting within the scope of his discretionary authority at the time of the alleged misconduct. See Paez v. Mulvey, 915 F.3d 1276 (11th Cir. 2019) (citations omitted).  Once a defendant has established he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. See Lee, 284 F.3d at 1194.  The arresting officer would be entitled to qualified immunity unless the plaintiff establishes that  "(1) he violated a federal statutory or constitutional right, and (2) the unlawfulness of his conduct was 'clearly established at the time.'"  Manners v. Cannella, 891 F.3d 959, 968 (11th Cir. 2018) (quoting District of Columbia v. Wesby, – U.S. –, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018)).  These two requirements may be analyzed in any order.  See Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).  The

questions, then, boil down to whether Detective Bradley's conduct violated the Fourth Amendment, and whether it was clearly established at the time that his conduct did so.

False arrest is recognized as a violation of the Fourth Amendment and a viable claim under § 1983.  *See* Ortega v. Christian, 85 F.3d 1521, 1525–26 (11th Cir. 1996).  A claim for false arrest arises when an arrest occurs without a warrant and without probable cause.  *See* Brown v. City of Huntsville, Ala., 608 F.3d 724, 734 (11th Cir. 2010).

Where, as here, the plaintiff was arrested pursuant to a warrant, the plaintiff's only available claim against the arresting officer under § 1983 is for malicious prosecution.  *See* Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003); Whiting v. Traylor, 85 F.3d 581, 585 (11th Cir. 1996).  A plaintiff must prove the elements of the common law tort of malicious prosecution and that his Fourth Amendment right to be free from unreasonable seizures was violated.  *See* Wood, 323 F.3d at 881. Florida law sets out six elements for a malicious prosecution claim:  (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable

cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding.  *See* Kingsland v. City of Miami, 382 F.3d 1220, 1234 (11th Cir. 2004) (citations omitted).

In an action for malicious prosecution it is not necessary for a plaintiff to prove actual malice; legal malice is enough.  *See* Blackshear v. City of Miami Beach, 799 F. Supp. 2d 1338 (S.D. Fla. 2011) (construing Florida law); Alamo Rent–A–Car, Inc. v. Mancusi, 632 So.2d 1352, 1357 (Fla. 1994).  Legal malice requires proof of an intentional act performed without justification or excuse, and, unlike actual malice, does not require proof of evil intent or motive.  *See* Olson v. Johnson, 961 So. 2d 356 (Fla. 2d DCA 2007).  In this regard, legal malice may be satisfied by proof that the defendant acted recklessly and without regard to whether the proceeding was justified, *see* Morgan Intern. Realty, Inc. v. Dade Underwriters Ins. Agency, Inc., 617 So. 2d 455 (Fla. 3d DCA 1993), or by proof that the defendant did not have probable cause, *see* Winn-Dixie Stores, Inc. v. Gazelle, 523 So. 2d 648 (Fla. 1st DCA 1988). False testimony during the prosecution is also evidence of malice.  *See* Maiborne v. Kuntz, 56 So. 2d 720 (Fla. 1952).

Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.  Probable cause is not a high bar."

Wesby, 138 S. Ct. at 586 (internal quotation marks and citations omitted). Far from requiring convincing proof that an offense was committed, probable cause is a flexible and fluid concept, that looks instead to the totality of the circumstances to determine the reasonableness of the officer's belief that a crime has been committed. Manners, 891 F.3d at 968–69 (internal quotation marks and citation omitted). Accordingly, "[t]he test for probable cause is not reducible to precise definition or quantification," and "[f]inely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the [probable-cause] decision." Florida v. Harris, 568 U.S. 237, 243–44, 133 S. Ct. 1050, 185 L. Ed. 2d 61 (2013) (internal quotation marks and citations omitted).

Importantly, an affirmative defense to an alleged crime does not necessarily vitiate probable cause. See Manners, 891 F.3d at 971–72. Indeed, "arresting officers, in deciding whether probable cause exists, are not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present a sufficient basis for believing that an offense has been committed." Dahl v. Holley, 312 F.3d 1228, 1234 (11th Cir. 2002), *abrogated on other grounds by* Lozman v. City of Riviera Beach, –U.S. –, 138 S. Ct. 1945, 201 L. Ed. 2d 342 (2018). This is so, in part, because probable cause is a preliminary determination made initially in an ex parte proceeding. Again, it does not require

anything close to conclusive proof or proof beyond a reasonable doubt that a crime was in fact committed, or even a finding made by a preponderance of the evidence. *See* Manners, 891 F.3d at 968. "A law enforcement officer is not required to resolve every inconsistency found in the evidence." Paez, 915 F.3d 1276. Moreover, "police officers aren't lawyers; we do not expect them to resolve legal questions or to weigh the viability of most affirmative defenses." *Id.* (citing Williams v. City of Albany, 936 F.2d 1256, 1260 (11th Cir. 1991)). "So long as it is reasonable to conclude from the body of evidence as a whole that a crime was committed, the presence of some conflicting evidence or a possible defense will not vitiate a finding of probable cause." *Id.* The touchstone remains the reasonableness of the officer's conduct.

It is also true that officers may not lie about or conceal critical information. The Supreme Court has held that the Fourth Amendment demands that a warrant affiant provide information with a reasonable belief in its veracity:

> [W]hen the Fourth Amendment demands a factual showing sufficient to comprise "probable cause," the obvious assumption is that there will be a truthful showing. . . . This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct . . . [but] surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

Franks v. Delaware, 438 U.S. 154, 165–66, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). Intentional or reckless material misstatements or omissions in a warrant affidavit thus could violate the Fourth Amendment.  *See* Kelly v. Curtis, 21 F.3d 1544, 1555 (11th Cir. 1994).  Negligent misstatements or omissions, on the other hand, do not. *Id.*

The Eleventh Circuit employs a two-part test to determine whether a misstatement in an officer's warrant affidavit amounts to a violation of the Fourth Amendment.  *See* Paez, 915 F.3d 1276.  First, the court asks whether there was an intentional or reckless misstatement or omission.  *Id.*  Then, the court examines the materiality of the information by inquiring whether probable cause would be negated if the offending statement was removed or the omitted information included.  *Id.* (citations omitted).

Three basic rules, then, guide the court's consideration today:  (1) a warrant for arrest must establish probable cause for an offense; (2) a warrant affidavit must contain truthful statements that do support probable cause; and (3) an affidavit's omissions or misstatements may lead to an unreasonable and unconstitutional warrant-based arrest if information that the affiant knew about but intentionally or recklessly disregarded or misstated negates a finding of probable cause.

As the Supreme Court has explained in a similar context,

> [T]he . . . standard of objective reasonableness . . . defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest.  Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost.

Malley v. Briggs, 475 U.S. 335, 344–45, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986) (citation omitted); *see also id.*, 475 U.S. at 341 ("Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.").  Put another way, "if the affidavit[ ] (including the omitted information) would have demonstrated even arguable probable cause—that a reasonable officer <u>could have</u> believed an offense was committed–then the officer[ ] [is] entitled to qualified immunity."  <u>Paez</u>, 915 F.3d 1276 (citing <u>Grider v. City of Auburn</u>, 618 F.3d 1240, 1257 (11th Cir. 2010)) (emphasis in original).

Here, Detective Bradley has proven he was acting within the scope of his discretionary authority in investigating the shooting of Dominique Blount and in submitting the probable cause affidavit.  To establish that the challenged actions were within the scope of his discretionary authority, "a defendant must show that those actions were (1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority."  <u>Harbert Int'l, Inc. v. James</u>, 157 F.3d 1271, 1282

(11th Cir. 1998) (citation omitted); *see also* Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265–66 (11th Cir. 2004) ("We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize."). "In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." Holloman, 370 F.3d at 1266 (emphasis added). In other words, when determining the scope of discretionary authority, a court looks to the general nature of a defendant's action, not the specific unconstitutional conduct. *See* Harbert Int'l, 157 F.3d at 1282 (providing that "[t]he inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act"). "Of course, we must be sure not to characterize and assess the defendant's act at too high a level of generality" but instead "we consider a government official's actions at the minimum level of generality necessary to remove the constitutional taint." Harland, 370 F.3d at 1266.

Applied here, Detective Bradley has satisfied his burden of proving that the acts of investigating reported offenses and submitting a probable cause affidavit in support of an arrest warrant generally fell within his duties as a detective in the PPD

(*see* Mot. Summ. J., Ex. I, Def.'s Aff.).  Additionally, investigating reported offenses and submitting a probable cause affidavit were within the perimeter of Bradley's job-related functions, and the means he utilized (interviewing the victim, possible witnesses, and potential suspects, as well as collecting physical evidence, preparing a probable cause affidavit, and obtaining a supervisor's approval) were within Bradley's authority as a detective in the PPD.  Therefore, the burden shifts to Richardson to demonstrate that the facts, viewed in light most favorable to him, show that Detective Bradley lacked arguable probable cause to arrest him.

After reviewing all the relevant information—what was included and what was omitted—a reasonable officer could have believed that Richardson broke into Ms. Blount's home, shot her, and robbed her.  A reasonable officer could have believed Ms. Blount's account and identification of Richardson set forth in the probable cause affidavit, even though Ms. Blount provided earlier inconsistent accounts of the shooting and delayed providing her statement and evidence to police. Ms. Blount's failure to be forthcoming immediately was explained by the fact that her motion to terminate probation (a condition of which was that she not possess a firearm) was pending at the time she was shot with a firearm she possessed.  As previously discussed, so long as it is reasonable to conclude from the body of evidence as a whole that a crime was committed, which is the case here, the presence

of some conflicting evidence will not vitiate a finding of probable cause.  *See* Paez,

915 F.3d 1276.

Further, the fact that Richardson's photo was included in the line-up based

upon Ms. Blount's describing the shooter as "Ivin" who she knew from the

neighborhood, instead of physical characteristics such as height, weight, etc., did not

render the photo line-up suggestive or mislead the judge.  And Detective Bradley's

failure to verify whether Richardson was in Miami at the time of the shooting, or to

include the fact that Richardson claimed to be in Miami in the probable cause

affidavit, did not vitiate the existence of probable cause, because Richardson did not

provide this explanation until after Detective Bradley submitted the probable cause

affidavit, and even then, the information Richardson provided was paltry.  Finally,

the fact that Detective Bradley failed to process Ms. Blount's house or the shell

casing for fingerprints did not vitiate probable cause given Ms. Blount's statement

that her attacker wore gloves.

Considering the undisputed facts, and construing any disputed facts in

Richardson's favor, a reasonable officer could have concluded, from the entire body

of evidence, that Richardson committed an offense.  Therefore, Detective Bradley is

entitled to qualified immunity on Richardson's Fourth Amendment claims.

2.    Fourteenth Amendment Equal Protection Claim

Richardson claims that Detective Bradley violated his equal protection rights guaranteed by the Fourteenth Amendment (Second Am. Compl., p. 15). Richardson alleges he and Dominique Blount were similarly situated because they were both shot (*id.*, p. 11). Richardson argues Detective Bradley arrested him for shooting Dominique Blount based upon Blount's identifying him as the shooter; but Bradley refused to arrest Antoine Wilson for shooting him (Richardson), even though Richardson identified Wilson as the shooter (*id.*).

Detective Bradley contends Richardson's equal protection claim fails, because Richardson has not alleged, and cannot establish, that he and either Ms. Blount or Mr. Wilson were similarly situated (Mot. Summ. J., pp. 23–25). Bradley further argues Richardson cannot identify admissible evidence showing that any alleged difference in the manner Bradley treated them was motivated by discrimination, or lacked a rational basis.

The Equal Protection Clause of the Fourteenth Amendment requires the government to treat similarly situated people alike. *See* City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). To state a traditional claim of discrimination under the Equal Protection Clause, a plaintiff generally must allege that (1) he is similarly situated with others who received more favorable treatment; and (2) his discriminatory treatment was based on some

constitutionally protected interest such as race. *See* <u>Jones v. Ray</u>, 279 F.3d 944, 946–47 (11th Cir. 2001) (internal quotations omitted). Thus, to assert a viable equal protection claim, a plaintiff must first make a threshold showing that he was treated differently from others who were similarly situated to him. *See* <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992); <u>Hendking v. Smith</u>, 781 F.2d 850 (11th Cir. 1986). To be "similarly situated," the comparators must be "prima facie identical in all relevant respects." <u>Grider</u>, 618 F.3d at 1264 (citations omitted). The plaintiff must also allege that the defendant acted with the intent to discriminate against him. *See* <u>McClesky v. Kemp</u>, 481 U.S. 279, 292, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987); <u>E & T Realty v. Strickland</u>, 830 F.2d 1107, 1113 (11th Cir. 1987). Conclusory allegations or assertions of personal belief of disparate treatment or discriminatory intent are insufficient. *See* <u>GJR Inv., Inc. v. County of Escambia, Fla.</u>, 132 F.3d 1359, 1367–68 (11th Cir. 1998); <u>Coon v. Ga. Pac. Corp.</u>, 829 F.2d 1563, 1569 (11th Cir. 1987).

The Equal Protection Clause is also implicated in "class of one" claims. <u>Campbell v. Rainbow City, Ala.</u>, 434 F.3d 1306, 1314 (11th Cir. 2006). A "class of one" equal protection claim does not allege discrimination against a protected class, but rather it alleges that the plaintiff "'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in

treatment.'"  Griffin Indus. v. Irvin, 496 F.3d 1189, 1202 (11th Cir. 2007) (quoting

Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d

1060 (2000)).  The same strict "similarly situated" standard applies whether an equal

protection claim is brought under a "class of one" theory or a traditional theory of

unlawful discrimination.   Id. at 1204–05.   Indeed, the "similarly situated"

requirement must be rigorously applied in the context of "class of one" claims.  See

Leib v. Hillsborough Cnty. Pub. Transp. Comm'n, 558 F.3d 1301, 1306 (11th Cir.

2009).

Here, Richardson cannot prove that Detective Bradley's arresting him but not

arresting Antoine Wilson was motivated by class-based discrimination.  Richardson

admits that he, Ms. Blount, and Antoine Wilson are all of the same race (Mot. Summ.

J., Ex. J, Pl.'s Dep. 44:21–45:1), and Richardson does not allege discrimination

based upon any other constitutionally protected class.

Additionally, Richardson has not stated a plausible "class of one" claim,

because he has not alleged facts which plausibly show that he and either Dominique

Blount or Antoine Wilson were "prima facie identical in all relevant respects."  The

only alleged similarity between Richardson and Ms. Blount is that they were both

victims of separate shootings.  The only alleged similarity between Richardson and

Mr. Wilson is that they were both identified as shooters by different shooting

victims.  Further, Richardson has not disputed Detective Bradley's evidence that Bradley investigated Richardson's allegation that Antoine Wilson shot him.  The evidence shows that the results of Bradley's investigations into Ms. Blount's shooting and Richardson's shooting were far from identical in all relevant respects. Richardson has not shown he will be able to produce evidence at trial from which a reasonable fact finder could determine that he was identical in all relevant respects with either Ms. Blount or Mr. Wilson.  Therefore, Detective Bradley is entitled to summary judgment on Richardson's equal protection claim.

### 3.    Fourteenth Amendment Due Process Claim

Richardson claims that Detective Bradley violated his due process rights guaranteed by the Fourteenth Amendment (Second Am. Compl., p. 15).

Detective Bradley correctly argues that if a constitutional claim is covered by a specific constitutional provision, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process (Mot. Summ. J., pp. 25–26).  *See* Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).  In this case, Richardson's false arrest/malicious prosecution claims are covered by the Fourth Amendment.  Therefore, Richardson cannot state a substantive due process claim under the Fourteenth Amendment.  *See* Albright v. Oliver, 510 U.S. 266, 275, 114 S. Ct. 807, 1127 L. Ed. 2d 114 (1994).

III.    RICHARDSON'S MOTION TO STRIKE

As  final matter, the court will address Richardson's motion to strike Detective
Bradley's motion for summary judgment (ECF No. 54).   Richardson contends
Bradley's evidentiary materials are not supported by affidavit or declaration, and
they contain hearsay which would not be admissible in evidence (*id.*).

Richardson's argument is without merit.   Detective Bradley's evidentiary
materials include Bradley's own affidavit (Ex. I), excerpts of Richardson's
deposition (Ex. H), and court dockets, documents, and other public records (Exs. B,
C, D, E, F, G, K, M, N, O, P, Q, R, S, T, U, V, W, X, Y, Z), all of which are properly
considered on summary judgment.    Additionally, although the Budget Inn
registration records submitted by Detective Bradley are not authenticated (Ex. L),
they readily could be at trial.   Further, the court's dispositive determination, that
Detective Bradley had arguable probable cause to arrest Richardson, would not be
affected even if the court excluded the motel records.

To the extent Richardson contends the Offense Report (*see* Mot. Summ. J.,
Ex. I, Def.'s Aff., attached Ex. A) may not be considered because it includes hearsay,
he is wrong.  Hearsay is a statement offered by a party to prove the truth of the matter
asserted in the statement.  *See* Fed. R. Evid. 801(c)(2).  Detective Bradley does not
offer the statements included in the Offense Report for the truth of the matters

asserted in those statements; rather, he offers the statements to show the information with which he was presented at the time he submitted the probable cause affidavit in support of the arrest warrant.

The remainder of Richardson's motion to strike is his reassertion of arguments made in his Opposition to the motion for summary judgment, and his rehashing of the discovery dispute which was resolved in Detective Bradley's favor (the court denied Richardson's motion to compel and his motion for reconsideration of the order denying the motion to compel) (*see* ECF Nos. 36, 39, 40, 45, 46). The court has considered Richardson's arguments in opposition to the motion for summary judgment. Further, the court will not re-adjudicate the discovery issue. Richardson's motion to strike should be denied.

Accordingly, it is respectfully **RECOMMENDED**:

1. That Defendant's Motion for Final Summary Judgment (ECF No. 41) be **GRANTED**.

2. That Plaintiff's "Motion for Order to Strike Defendant's Motion for Summary Judgment as Legally Insufficient, to Strike Exhibits, Affidavits, Paragraps [sic]" (ECF No. 54) be **DENIED**.

3. That the clerk of court be directed to enter final judgment in favor of Defendant and against Plaintiff and close the file.

At Pensacola, Florida this <u>25th</u> day of March 2019.


/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations may be filed within 14 days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**